POPULAR DEMOCRATIC PARTY ET AL., Petitioners, *v.* INSULAR BOARD OF ELECTIONS, ETC., Respondent.

No. 396. Argued March 16, 1944.—Decided March 28, 1944.

*Samuel R. Quiñones, Luis A. Negrón López,* and *Miguel Guerra-Mondragón* for petitioners. *F. Fernández Cuyar, Leopoldo Figueroa, A. García Rodríguez,* and *Cayetano Coll y Cuchí* for Insular Board of Elections. *M. Rodríguez Ramos, Assistant Attorney General,* and *G. Benítez Gautier, Deputy Attorney General,* for Supervisor of Elections. *H. González Blanes* for intervener, Union Republican Party.

OPINION OF MR. JUSTICE DE JESÚS.

At the registrations held in this island on January 15 and 16 last, a total of 277,471 applications for registration were filed with the various registration boards. Out of that total there are 85,019 applications which, although not protested, do not meet the requirements of law. A number of them are not even signed by the supposed applicants, and in those cases where the applicant did not know how to sign, there does not appear in the application the fingerprints as required by law. In others the signature of the identifica-

tion witness is lacking. In others there is no signature of any member of the registration board attesting the oath of the voter. In others the name of the voter appearing in subdivision one of the application differs from the name which appears in the subdivision corresponding to the name of the voter. Lastly, a number of the applications are not signed by the members of the registration board where the said applications were filed.

These 85,019 applications were sent to the General Supervisor of Elections together with the other unprotested applications which did not show the defects stated, and the Insular Board of Elections, after classifying them as aforesaid, resolved by a majority vote not to include the said 85,019 applications in the register of voters. Consequently, the General Supervisor of Elections refused to enter the names of those 85,019 voters in the list of newly registered voters for each electoral precinct pursuant to the provisions of §27 of the Election Law.

Feeling aggrieved by the aforesaid resolution of the Insular Board of Elections and by the decision of the General Supervisor of Elections, the Popular Democratic Party, Luis Muñoz Marín, Samuel R. Quiñones, and David Benjamín Cruz, filed in this court the application for a writ of mandamus in this case: the Popular Democratic Party, on the ground that over 55,000 out of the 85,019 persons who filed applications for registration and who would be deprived of the vote should the attitude of the board and the General Supervisor of Elections prevail, were affiliated with the said party; Luis Muñoz Marín, because, as he alleges, he is going to be nominated and proposed as a candidate by said party for one of the insular elective offices at the general elections to be held next November 7; Samuel R. Quiñones, because he is a duly registered and qualified voter of the second precinct of San Juan, and member at the same

time of the Insular Board of Elections in representation of the Popular Democratic Party; and lastly, David Benjamín Cruz, alleging that he is a citizen of the United States of America; that on November 7, 1944 he will have over one year of residence in Santurce; that he appeared to register and did register as a voter in accordance with the provisions of the Registration Act before one of the registration boards of the precinct of Santurce, and presented his application to said board on the printed form prescribed by §16 of the Registration Act, in which application some' of the blanks pertaining to subdivisions 22 to 27[1] do not appear to be filled out. The said petitioner also alleges that the registration board handed to him one of the duplicates of his application for registration which, together with a certified copy of the original of the said application, he attached to the complaint in this case, making them a part thereof, and marking them Exhibits 2 and 3, respectively; that his application for registration was not protested, notwithstanding which the applicant, his application being included among the 85,019 aforesaid, will be deprived of his vote by virtue of certain rules adopted by the Insular Board of Elections on January 24, 1944, whereby it is prescribed that the defects shown in the said 85,019 applications for registration warrant their cancellation and exclusion from the registrar of voters. The petitioner David Benjamín Cruz further alleges that he appears in his own behalf and in behalf of the class of voters registered on the 15th and 16th of January last affected by the aforesaid rules, and that he appears in behalf of the said class because it is too numerous to have its members included as petitioners in this action.

---

[1] It seems advisable to note that among the subdivisions appearing unfilled in the application for registration is included even that corresponding to the signature of the member of the Registration Board who should have administered the oath of David Benjamín Cruz.

The petitioners allege that the said rules are void because they have not been approved by the Governor, but that even assuming that they had been so approved, they would still be void because the Insular Board of Elections lacks power to pass upon the validity of the said 85,019 applications for registration which were not protested, the power to investigate the contents of said application being vested exclusively in the respective registration boards which, after completing their mission on January 15 and 16, 1944, ceased to have any legal existence.

In support of that conclusion are alleged a series of grounds marked with the letters "a" to "p" inclusive, which we do not state here in order to avoid making this opinion unnecessarily lengthy, although that does not mean that we will fail to consider those grounds which deserve to be discussed.

Protesting that they have no speedy, adequate, and effective remedy other than that of mandamus, the complaint closes with the prayer that two writs of mandamus be issued, one directed to the Insular Board of Elections of Puerto Rico, and its members Charles H. Terry, Leopoldo Figueroa, Luis N. Dubón, Lino Padrón Rivera, and Adolfo García Rodríguez, to proceed pursuant to §25 of the Election Law of Puerto Rico to include in the register of voters all the citizens who registered at the general registration held January 15 and 16, 1944, including, of course, the 85,019 citizens whose applications for registration are defective, without annulling or cancelling said applications; and another writ directed to Charles H. Terry, in his capacity as General Supervisor of Elections of Puerto Rico, commanding him to forthwith cause to be prepared for each election precinct, by *barrios,* and in alphabetical order, a list of all the said voters, setting forth therein the name, age, color, sex, and address of each of the registered voters as provided in §27 of the Election Law of Puerto Rico.

The petitioners pray, further, that respondents be directed to refrain, until the further order of this court, from cancelling or annulling any of the aforesaid 85,019 applications.

After the alternative writs of mandamus prayed for were issued, the hearing of the case commenced on the 13th instant, on which date there appeared the Insular Board of Elections and respondent members thereof, including Mr. Terry, all of them filing a single answer in opposition to the claims of the petitioner. On the same date there was filed a motion of consent to the petition for mandamus, signed by the Attorney General of Puerto Rico in behalf of the General Supervisor of Elections, in which the General Supervisor of Elections, among other things, states that after duly examining the petition for mandamus as well as the alternative writ issued he consents to the demands of the petitioners. The Union Republican Party requested leave to appear in the case as a respondent, which request was granted without opposition of the parties.

The Insular Board of Elections declared at the hearing that its power to reject the said 85,019 applications for registration was not predicated on the rules adopted January 24, 1944, which it is discarded for all the purposes of this case, and alleged that its power arises from the provisions of the Registration Act and the Election Law.

The first question to be determined is whether the Insular Board of Elections has the power to refuse to include in the register of voters the applications for registration which were not protested before the respective registration boards, notwithstanding that said applications do not comply with the requirements of §§16, 17, 18, and 19 of the Registration. [1a]

---

[1a] The said Section provides:

"Section 16.—Any voter desiring to register shall appear before the proper registrations board and shall present a printed application in triplicate, filling

In our judgment, it clearly appears on the face of the complaint that the 85,019 applications for registration do not comply with one or more of the said Sections.

We grant that no legal provision exists which expressly authorizes the Insular Board of Elections to examine applications for registration that are not protested, and to refuse to include in the Register of Voters the names of those persons whose applications for registration do not meet the requirements demanded by the Registration Act. But we have no doubt that the said power arises implicitly from several Sections of said Act. We thus see that §4 of the Registration Act provides that the Insular Board of Elections shall have charge *of the supervision and direction of registrations* in Puerto Rico, and authorizes it, further, to prepare blank forms for applications for registration, and blank forms for protests and counter-protests; and §25 vests it with power to prescribe rules and regulations for the purpose of holding peaceful and legal registration. Finally, §31

---

in the blanks with ink or with a typewriter, in accordance with the form given below.

"Each petition shall be signed by the interested person and a witness, a resident of the same munipality, well known, and knowing how to read and write. Said witness shall declare that he knows all statements contained in the said application to be true, and shall take oath, together with the applicant: (The model for the application for registration follows here).

"Section 17.—When the applicant does not know how or is unable to sign his name, he shall make thumbprints of both thumbs, if possible, at the side of the signature of the witness signing for said voter.

"Section 18.—No application shall be received except on printed forms in accordance with the aforesaid model, and it shall be the duty of the registration board, whenever it receives any petition that does not agree with the official model, to state the reason of the fault, and shall sign, act and proceed as if it were a case of a challenged registration.

"Section 19.—Applications for registration shall be sworn to before any member or substitute member of the registration board of the registration place to which they belong, in the registration place of said board and during the hours duly fixed and proclaimed for registrations in the said place; and all members and substitute members of registration boards are hereby authorized to administer oaths on the said applications in the places and during the time specified. The correlative presentation number shall be placed on the petitions for registration."

in its pertinent part reads as follows: "But it is expressly declared that all such provisions of said election law as are not in conflict with the provisions hereof, may be enforced by the Insular Board of Elections whenever it shall be necessary *in order to hold peaceful and legal registrations.*" (Italics ours.)

To maintain that a governmental organization on whom the Legislature imposed the delicate duty of *supervising and directing* the registrations in Puerto Rico; to whom it entrusted the power to prepare application blanks for registration; in whom it vested power to prescribe rules and regulations for the purpose of holding peaceful and *legal* registrations; and whom it expressly authorized to *apply* all such provisions of the Election Law as are not in conflict with the provisions of the Registration Act, whenever it may be necessary for the holding of peaceful and *legal* registrations; to maintain, we repeat, that such an organization lacks power to reject, and has to admit as valid, applications for registration which suffer from the defects hereinabove set forth, is equivalent to a determination to remain blind to what, from an excess of light, hurts the eyes. Can that interpretation be reconciled with the powers that the lawmaker, as we have seen, vested in the Insular Board of Elections? Is it logical to maintain, as claimed, that the registration boards whose mission, as alleged by the petitioners themselves, ends at the close of the last day fixed to receive applications for registration, have more power than the Insular Board of Elections which appoints them,[1b] and that notwithstanding the grave duty imposed on it by law

---

[1b] The only power that §6 of the Registration Act grants to the General Supervisor of Elections concerns the ministerial duty of making appointments at the request of the central or local directing committees of the party which each one of the members of the registration board represents, the same section providing that vacancies occurring in these registration boards shall be filled in the manner provided by the Insular Board of Elections, always taking into account that the substitute must belong to the same political party as the member causing the vacancy.

the latter is compelled to accept blindly the actions of the registration boards however illegal they may be? In the case of *Sibley* v. *Staiger,* (Ill., 1932), 179 N. E. 877, 878, it was held that "While it is a rule that mistakes or omissions of the officers in charge of an election will not defeat the plainly expressed will of the voters, yet the rule does not apply where," as in the present case, "the officers have failed to perform mandatory duties of a precautionary character which safeguard the votes of the electors."

But the fact is that, apart from what has been set forth, the petitioners themselves in paragraph 19 of their petition for mandamus, and by accompanying and making an integral part of the said petition Exhibit V, which contains the rules adopted by the Insular Board of Elections on February 1, 1940, seem to admit the power of the Insular Board of Elections to pass on the validity or insufficiency of unprotested applications for registration transmitted to it by the registration boards. It seems advisable to transcribe here paragraph nineteen of the petition:

"After the general registrations of 1940, the Insular Board of Elections adopted unanimously—without there having taken any part in the voting the representative of the Popular Democratic Party who did not then have a vote on said board—some rules to amend certain defects in the applications for registration, similar to the defects included in the rules above transcribed, and in 1940, on the basis of such rules approved in the said year, the Insular Board of Elections facilitated the correction of applications for registration defectively filled out, without a single complaint being filed with the Insular Board of Elections because of the procedure employed in 1940 for the said correction of defective applications. The rules adopted by the Insular Board of Elections, as hereinabove alleged, are attached in a duly certified copy marked Exhibit V and are made an integral part of this petition. And the petitioners allege that if in the year 1940 the Insular Board of Elections *adopted rules to correct, as in fact it did correct, defects in applications for registration,* and to protect, as in fact it did protect, the right of suffrage of the voters who registered through such defective applications for

registration, the said board is barred from adopting in 1944 any rules which prevent the amending of defective applications for registration and which deprive of their right of suffrage all such voters as registered through such defective applications.'' (Italics ours.)

Let us examine now the rules adopted and applied by the Insular Board of Elections in February 1940, to which the petitioners refer in paragraph nineteen above transcribed:

''The Insular Board of Elections, at a meeting held today, adopted the following rules which shall govern *in the revision of unprotested applications for registration.* (Italics ours.)

''1. In case applications for registration appear without the signature of the voter or without his fingerprints, but which are signed by at least two of the members of the registration board, the same shall be transmitted to the president of the Local Board of Elections of the corresponding district so as to obtain the signature of the voters who filled such petitions. The General Supervisor of Elections shall give notice to all the members of the Insular Board of Elections and to the local committees in the municipalities where such applications for registration exist, in order to facilitate the locating of the voters affected, who shall appear before the Local Board of Elections composed of all its members as well as the observer, in whose presence the voters shall sign such applications or stamp their thumbprints thereon.

''2. In case applications for registration appear without the signature of the voter or without his fingerprints if he should not know how to sign, and without the signature of at least two of the members of the registration board, such applications shall be submitted to the Insular Board of Elections for *cancellation.*

''3. In case there should appear applications for registration signed by the respective voters or marked with their fingerprints, but lacking all the signatures of the members of a registration board, such applications shall be submitted to the Insular Board of Elections for cancellation.

''4. In case there should appear applications for registration in which there is a full and absolute discrepancy between the name of the voter, as shown in subdivision 1, and his signature, such applications shall be submitted to the Insular Board of Elections for *cancellation.*

"5. In case there should appear applications for registration without the signature of the member who administered the oath, but which appear signed at the bottom by at least two of the members of a registration board, such applications shall be accepted as good; if such applications, however, are signed by only one of the members of a registration board, said applications shall be transmitted to the president of the Local Board of Elections of the corresponding precinct in order to amend the omission in so far as concerns the signature of any other of the members of the registration board of the same registration place where the voter registered. In such cases a procedure similar to that set forth in paragraph No. 1 shall be followed.

"6. In case there should appear applications for registration without the signature of the identification witness in the case of voters who have signed their petitions or stamped their fingerprints, such petitions shall be accepted as good.

"San Juan, Puerto Rico, February 1, 1940.

"I certify that the foregoing is a full and exact transcription of the original thereof, said original being the rules unanimously adopted by the Insular Board of Elections of Puerto Rico at its meeting of January 31, 1940, in connection with the amending of defective applications for registration. I certify likewise that it all so appears from the minutes of the said meeting under my custody as General Supervisor of Elections of Puerto Rico.

"And at the official request of Attorney Samuel R. Quiñones, of San Juan, a member of the Insular Board of Elections, I issue these presents in this city, this first day of March, 1944.

"(Signed) C. H. Terry, General Supervisor of Elections."

If in February 1940, under the provisions of the same law in force today, the Insular Board of Elections had power to revise unprotested applications for registration; if in the exercise of that power the board even went so far as to permit that, contrary to law,[2] the defects of the said applications be corrected; if, as the petitioners seem to admit, in connection with defects equal to some of those appearing in the 85,019 applications, the board could go, in the exercise of its power of revision, so far as to cancel certain applications without giving any kind of notice, what legal point can the petitioners invoke now to maintain, as they do

---

[2] See §19 of the Registration Act, transcribed in note 1, page 288.

maintain, that the Insular Board of Elections, in so far as concerns the validity of the applications for registration, has to act as a mere automaton, compelled to accept as good the applications transmitted by the registration boards whatever the defects contained in such petitions?. Is it, then, that legal elections can be held based on applications for registration which do not meet the authenticity requirements demanded by law? The fact that the number of defective applications reaches the high figure of 85,019 can not affect the power of the board. On the contrary, the greater the number of applications which do not comply with the law, the greater the possibility that the elections are not legal, and the more zealous should the board be in the discharge of the difficult mission entrusted to it.

It is argued that the power to determine if the applications for registration meet or do not meet the requirements specifically demanded by the Registration Act is a judicial matter which can only be determined by the courts. We do not agree with this. The power that the Insular Board of Elections exercised in 1940 and seeks to exercise now is simply ministerial. In the case of *Scott* v. *Vaughan* (Mich., 1918), 168 N.W. 709, cited approvingly in *People* v. *Kelly* (Mich. 1940), 293 N. W. 865, 871 and in *Larkin* v. *Gronna* (N. D., 1939), 285 N. W. 59, 66, the Supreme Court of Michigan discusses the scope of ministerial duty. Section 12 of Article 16 of the Constitution of Michigan, in force since April 30, 1918, prohibits the manufacture, sale, keeping for sale, etc., of intoxicating liquors except for medicinal, mechanical, scientific, or sacramental purposes. Article 17, §2, of the aforesaid Constitution provides that amendments to the Constitution may be proposed by petition of the qualified voters of the State; that each petition shall include *the text of the amendment so proposed,* and the petitions shall be signed by not less than ten per cent of the qual-

ified voters of the State; that such petitions shall be filed with the Secretary of State at least four months in advance of the date of the election at which the proposed amendment is to be voted upon; that upon receipt of the said petitions the Secretary of State shall canvass the same to ascertain if they have been signed by the number of voters required by the Constitution, and if the petitions have been signed by the required number of voters, the proposed amendment shall be submitted to a vote at the next regular election at which any state officer is to be elected. It is prescribed, further, that the petition shall consist of sheets of paper having printed or written at the top thereof such heading as the Secretary of State may designate; that such petitions shall be signed by qualified voters in person only, with the residence address of such persons and the date of signing the same; that to each one of said petitions, which may consist of one or more sheets, shall be attached the *affidavit* of the voter circulating the same, stating that each signature thereto is the genuine signature of the person signing the same, and that to the best of his knowledge and belief each person signing the petition was, at the time of signing, a qualified elector. The constitutional precept provides, further, that such petitions so signed shall constitute *prima facie* evidence that the signature thereon are genuine, and that the persons signing are qualified electors.

The relators requested the Secretary of State to abstain from taking action on the petitions presented to him to amend §12 of Article 16 of the Constitution, for the reason that the said petitions did not comply with the requirement of copying literally the text of the proposed amendment. The Secretary of State consulted the Attorney General, who advised him to take the case to the Courts so that the latter might determine if the Secretary of State was authorized to determine if the petitions for amendment complied

with the law, or if, on the contrary, that was a judicial question to be decided exclusively by the court.

Proceedings for writ of mandamus were brought against the Secretary asking that he be directed to refrain from taking action on the said petitions because the same did not include the full text of the proposed amendment. An order to show cause having been issued, the Secretary of State answered admitting the facts set up in the petition, and alleging at the same time that his duty in connection with the matter was purely ministerial and that the determination as to whether the petitions complied or not with the Constitution was a judicial question to be decided by the courts and not by him.

In granting the mandamus by the unanimous vote of the eight justices who took part in the decision, the court declared that generally, the right of qualified voters of the state to propose amendments to the Constitution by petition can not be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises. Notwithstanding this, *the right should be exercised in a certain way and according to the conditions specified in the Constitution.* It was held, further, that the ascertainment of whether the petition included the full text of the proposed amendment and of whether the petitions were signed by not less than ten per cent of the qualified voters of the State, involved the exercise of no discretion—the performance of none but a ministerial duty. And that the performance of a ministerial duty may involve something more than doing a prescribed thing in a prescribed way. One must appreciate the meaning and effect of what appears upon the face of a petition before he can determine whether, upon its face, what is present is or is not a petition. In the same way that an officer can be compelled by mandamus to take action on a proper petition he may, by mandamus, also be compelled to refuse to take action on an improper petition since it is

his duty to reject the petitions—or at least to refuse to take further action thereon when said petitions do not conform to the constitutional mandate.

Similarly, the Insular Board of Elections in order to exercise the ministerial power vested in it by law to direct that persons who have filed applications for registration which are *prima facie* valid, be included in the register of voters, has power to examine such petitions to determine if the same comply with the requirements of law.

It seems advisable to cite here the case of *Morrissey* v. *State Ballot Law Commission* (Mass., 1942), 43 N. E. (2) 365, 395, where it is held that the position of a person signing a petition of amendment to the Constitution is analogous to that of a voter who signs a nomination ballot for an election or who votes at an election. The right that the Constitution guarantees to him is to exercise his privilege as a voter in accordance with reasonable rules concerning the manner of voting.

The petitioners argue that to fail to include the names of the 85,019 persons in the register of voters without notice of their noninclusion is equivalent to depriving them of the right to vote without due process of law. We must not lose sight of the fact, in the first place, that for the right to vote to exist it is necessary, as we said before, that the voter exercise his right in the manner and under the conditions required by law, among which is found that of filing with the registration board an application for registration meeting the requirements demanded by law. *Scott* v. *Vaughn*, *supra: In re Opinion of the Justices* (Mass., 1924), 143 N. E. 142. But the fact is that the voter has such notice through the lists that not later than March 31 of the year in which an election is to be held are sent by the General Supervisor of Elections to the chairmen of the local boards of elections. Pursuant to §27 of the Election Law the chairmen of the local boards of elections shall post a copy of such list to

the public in a conspicuous, accessible, and protected place at the entrance to the offices of their respective boards. In addition to these lists sent to the chairmen of the local boards, the same §27 provides that other copies of them shall be sent on the same date to the chairmen of the sections and local committees of the principal political parties. Any voter who is interested in making use of his right to vote has an easy opportunity from and after March 31 of an election year to learn from the lists posted to the public or from the lists of the local committee of his party in the precinct where he lives, whether his name has been included or not in the list of registered voters. Should it not appear in said lists he can institute the proper proceeding to obtain that it be included, if he has a right to be included. And what less can be required of a citizen whose application for registration does not meet the requirements of law?

In order that due notice exist it is not indispensable that such notice be personal in every case, much less when the number of persons to be notified is as large as it is in the present case. To hold that a notice in the manner indicated, that is, through the posting of lists in places accessible to the public, imposes on the citizen a duty he is not obliged to discharge, is a frivolous contention. Notices are given and served frequently through the newspapers, and such notice does not cease to be valid merely because to learn of it the person aggrieved has to buy or otherwise acquire the newspaper which publishes it.

██ Coming now to the contention that this is a class suit, and after it has been shown that the board has the power to pass on the sufficiency of the form of the applications for registration, it is easy to conclude that the present action is not class litigation, since no common right exists in it between David Benjamín Cruz and the 85,018 remaining persons whose applications for registration the Insular Board of Elections refuses to enter in the register of

voters. We have already seen that the defect in the application for registration, that is, that the signature of the member of the board who should have administered the oath of David Benjamín Cruz does not appear thereon, is not a defect common to the other petitions. Furthermore, a document alleged to have been sworn to, where the jurat does not include the signature of the officer who should have administered the oath, carries with it the presumption that no such oath existed, it being incumbent upon the person alleging its existence to overcome the presumption by proving that the oath was in fact taken. David Benjamín Cruz did not in the present case overcome such presumption inasmuch as in his testimony before this court he stated that he did not remember having taken such oath.

█ It is argued that when we recognize the right that the Insular Board has in our judgment to refuse to include in the register of voters the names of the persons whose applications for registration do not meet the requirements of law, it is equivalent to granting it a power so vast that at any time the Insular Board might capriciously eliminate old voters from the lists thereby changing the result of an election.

That argument ignores the fact that subdivision 15 of §102 of the Law of Evidence prescribes that the presumption exists that official duty has been regularly performed. The argument which, in order to challenge the interpretation of a statute, has to be based on a possibility so extreme and improbable as that of an officer committing a fraud in the performance of an official duty he has sworn to perform in accordance with law, has very little persuasion. If such a case arose a mandamus would lie to compel the board to reestablish those voters in the lists, aside from the severe penalties which would be incurred by the members of the board. See McCrary on Elections, 4th edition, §135, p. 102.

█ It is a well-established rule that the remedy of mandamus does not lie unless he who invokes it has a clear and unequivocal right to such remedy. In the present case we do not see that the 85,019 persons whose applications for registration do not meet the requirements demanded by law, have a clear and unequivocal right to have their names included in the register of voters.

█ Finally, the fact that the General Supervisor of Elections consents to include in the provisional list the names of the 85,019 persons in question, does not affect the decision of this case, inasmuch as the General Supervisor of Elections is a member of the Insular Board whose ministerial duty to prepare the provisional lists is dependent upon the Insular Board having directed that the names of the persons who should appear in the provisional lists be previously included in the register of voters.

In view of the foregoing, it is proper, in our judgment, to deny the issuance of the writ of mandamus.

---

CONCURRING OPINION OF MR. CHIEF JUSTICE TRAVIESO

March 29, 1944.

I am entirely in accord with the opinion delivered by Mr. Justice De Jesús, and I believe, as he does, that the writ of mandamus prayed for does not lie. Its issuance in a case like the present would be equivalent to a declaration that the mandatory provisions of §§16, 17, 18, and 19 of the Registration Act, as regards the requirements to be met by every voter who desires to register, mean nothing; that an application for registration that complies strictly with the provisions of said Sections has the same value and legal force as another which has not been signed by the applicant or by the witness or by either of the two, or which has not been sworn to by the applicant or by the witness before any member of the registration board; and that the power

vested by the Registration Act in the Insular Board of Elections to supervise and direct the registrations of new voters in Puerto Rico, mean nothing, the sole function of the said organization being that of receiving the applications for registration, whatever the manner in which the same have been executed, and to pass them on to the General Supervisor of Elections to form with them the register of voters.

It is impossible to accept that the selfsame Legislator who expressed clearly his wish that registrations be held peacefully and in accordance with the law, and who, with the same lofty purpose vested in the Insular Board of Elections the necessary powers to supervise and direct those registrations, had in mind the idea that the best means of supervising and directing registrations is to close the eyes in the face of the most flagrant violations of the law and to give to any document coming before the Board, even when the same lacks the signatures and the oath required by law, the same treatment and consideration given to an application for registration which *prima facie* meets the requirements of the statute.

When the application for registration complies *prima facie* with all the legal requirements and has not been protested, the Insular Board of Elections and the General Supervisor of Elections have the ministerial duty to take action thereon and to enter the name of the applicant in the list or register of voters. Neither the Board nor the Supervisor would have authority to refuse to take action on an application thus executed, even when a charge of fraud is filed against it, since the determination of the existence or nonexistence of fraud in the execution thereof is a judicial function outside the jurisdiction of the Insular Board and of the Supervisor. However, when in contravention of what has been specifically provided by law, the signature of the applicant or the witness does not appear in the alleged application for registration, or when for lack of the signature

of the officer who administered or should have administered the oath, the presumption arises that the oath required by §19 of the Registration Act was never taken, the Board and the Supervisor have the ministerial duty to reject the document and to refuse to treat and consider it as an application for registration. And in doing so they are not exercising any judicial function, much as the cashier of a bank is not exercising such function when he refuses to cash a check on which the signature of the drawer does not appear, even though his name should be printed at the margin of the check. An alleged application for registration which is not signed, or which, being signed, has presumably not been sworn to by the applicant, is not the application for registration which gives the right to enter the name of a voter in the official register of voters.

The right to vote, as all human rights having a political character, is necessarily subject to such reasonable rules as the legislative power has deemed advisable to promulgate in order to protect its exercise. The vote would become a travesty and a serious threat for democratic institutions if all citizens, including those legally disqualified, could enjoy it without submitting to legal restrictions and requirements. The fundamental purpose of the Registration Act—to guarantee, insofar as may be humanly possible, an honest election by preparing beforehand a register of legally qualified voters—would be defeated if the Insular Board of Elections found itself compelled to include in the register the names of thousands of supposed voters on the strength of documents which in themselves show, not a partial or imperfect compliance with law, but the most absolute noncompliance with one or more of the essential requirements which, in accordance with law, every person must comply with who wishes his name to be included in the register of voters. Neither ignorance of the law nor the noncompliance with or disobedience of its provisions may be invoked as grounds

for the claiming of a right. Should we hold otherwise, we would introduce chaos in our election system and would open the doors wide to fraud.

We agree with the petitioners that each of them has the right to overcome the presumption that his application was not sworn to as required by law, or to state the reasons, if any there be, why the application was not signed by him or by the identification witness. If the applicant voter did in fact take the oath required by law, the negligence of the officer administering the oath should not be considered sufficient cause to deprive the applicant of his right to vote. It is the applicant, who presumably failed to comply with the law, on whom rests the burden to destroy the presumption by appealing to the courts of justice for the protection of his right. While the presumption of noncompliance stands, the Insular Board of Elections must abstain from making the registration.

The evidence presented in the course of this proceeding clearly establishes that there is a fundamental defect in our Registration Act. The term fixed for the registration of new voters—practically half a day for men and half a day for women—is exceedingly short. We see no reason which justifies that unreasonable limitation, and which prevents the fixing, as has been done in the majority of the states of the Union, of a term sufficiently ample, in some cases a period of several months prior to the elections, so that the registrations may be carried out with ease and without that haste which seems to have been the principal cause of the large number of incomplete applications appearing in the last registrations.

The issuance of the writ of mandamus applied for is not the proper remedy to solve the situation presented to the consideration of this Supreme Court. The deficiencies of the Registration Act should be corrected by the Legislature. A voter who believes that his name has been illegally excluded

from the register of voters can appeal to the competent courts in demand of protection for his individual right as a voter.

---

OPINION OF MR. JUSTICE TODD, JR.

After carefully and conscientiously considering the allegations of the parties and the evidence adduced by them, we are of the opinion that this case presents only one fundamental question, to wit: Has the Insular Board of Elections power to cancel applications for registration not protested before the registration boards acting during the 15th and 16th of January 1944?

Alleging that the Insular Board of Elections lacks authority to adopt certain rules tending to ascribe to it such power, the petitioners have applied to this court for a peremptory writ of mandamus directed to the said board and to the Supervisor of Elections commanding them to include in the lists and registers of voters the names of 85,019 voters who registered at the registrations held on the said dates.

The Supervisor of Elections consented to the petition. The Insular Board of Elections, represented by a majority of its members, is opposed to it, and likewise the Union Republican Party, whose intervention was allowed by the court. Both allege that, aside from the rules to which the petition refers, the Insular Board of Elections has the said power in accordance with the Registration Act of 1939 (Act No. 19 of June 10, 1939) and the Election Law in force. They hold, further, that no class action is involved in this case, because there is no "community of interest" between the petitioner David Benjamín Cruz and those he represents.

As regards the latter question it will suffice for us to say that if the Insular Board of Elections lacks power to cancel registrations of voters, it is obvious that a "common question of law" exists between the petitioner David Ben-

jamín Cruz and those he represents, which affects "the several rights" and, therefore, he can apply for "a common relief" as provided in Rule 23 (a)(3) of the Rules of Civil Procedure adopted by this Supreme Court. See 30 Michigan Law Review 878; 30 Cal. Law Review 350; 19 Cornell Law Quarterly 399; *Weeks* v. *Bareco Oil Co.,* 125 F. (2d) 84, and Cf. *Rivera* v. *Tugwell, Governor,* 59, P.R.R. 834.

 We do not deem it proper, in view of the conclusion reached by us, to consider and decide the other legal questions raised by the parties. The primary question herein is one of jurisdiction, and in the face of it all the others are, for the moment, lacking in importance. Besides, said jurisdictional question involves, and on its determination depends, whether 85,019 persons who were presumably registered as voters since their applications were not protested under oath, can be excluded without a hearing from the provisional or permanent voting lists, and whether they should be the ones called upon to file individual or joint actions in order to have their names included in said lists.

In stating the theory of their case on the day of the hearing, the respondents expressly set forth that the action which might be taken in due course by the Insular Board of Elections is authorized by law. In their brief they go no further than to specify the requirements demanded by the Registration Act of those who wish to register and of the officials of the registration boards. The respondents have not cited any provision of law which expressly authorizes the Insular Board of Elections to cancel an application for registration which has not been protested. Under both the pleadings and the evidence, it is an admitted and established fact that various omissions, defects, errors, and irregularities exist in the 85,019 applications for registration. Those same omissions, defects, errors, and irregularities, however, existed in said applications on the 15th and 16th of January

308

1944, when the registration boards declared the registrations ended and transmitted the said applications, without any protest, to the Insular Board of Elections. Can the Insular Board of Elections, in its discretion, and in the exercise of an implicit power, refuse to include said applications in the lists of voters, or have the General Supervisor of Elections and the Board, on the contrary, the ministerial duty to include them? Let us first consider the law, in so far as it refers to the Insular Board of Elections, and later, in general terms.

Section 1 of the Registration Act of 1939, states the purpose thereof by saying:

"Section 1.—The purpose of this Act is to establish a new system of *registration* of voters, without having to repeal in its totality the Election Law of Puerto Rico, and this Act shall be understood to be amendatory of the aforesaid Election Law of Puerto Rico as to the provisions concerning the *registration* of voters, and *nothing else*." (Italics ours.)

Section 4 expressly restricts the intervention of the Insular Board of Elections in the registrations to the "*supervision and direction* of registrations in Puerto Rico . . '. ''

Section 5 directs the said Board to proceed, "to group or divide the different urban or rural *barrios* of each precinct into registration places" in accordance with the result of the preceding general election. Even though §6 authorizes the Insular Board of Elections to appoint "as many registration boards for the *registration* of voters for each precinct as there are registration places in the same," the truth is that these registration boards are not appointed by the Board, but, as provided in that same Section, by the General Supervisor of Elections, each member to be proposed by the directing central or local committee of the party which he represents. It is when a vacancy occurs in these boards that the Insular Board provides the manner of

filling the same "it always being taken into account that the substitute must belong to the same political party" as the member causing the vacancy.

Pursuant to §8, the Insular Board must, in every election year, by resolution approved by the Governor of Puerto Rico, fix a Saturday for the *registration* of female voters and the following day for the *registration* of male voters. That same Section provides then that "on said days *registrations* shall be held throughout the Island of Puerto Rico so that there may be registered those persons who were not duly *registered as voters and are legally entitled to registration,* and of those who, being registered, have established their domicile in the respective precinct one year prior to the date on which the election is held. Registration shall commence at one o'clock in the afternoon . . . and shall continue until every voter present in the respective place shall have *registered."*

Section 11 provides at the end that "the Insular Board of Elections is authorized to prescribe such rules and regulations as may *guarantee and insure for the voter the registration provided by this Act."*

And by §25 the Insular Board of Elections is authorized to prescribe, from time to time, rules for the purpose *"of holding peaceful and legal registrations, and may carry out the work of preparing and supervising the said registrations through the local election boards . . ."*

Finally, §31 expressly declares that "all such provisions of the said Election Law as are not in conflict with the provisions hereof, *may be* enforced by the Insular Board of Elections *whenever it shall be necessary in order to hold peaceful and legal registrations."* (All italics are ours.)

After briefly reviewing all the provisions of the Registration Act which refer to the Insular Board of Elections, we should, following §31 just cited, also review the Election Law in force, in order to see if it contains any provision

which authorizes the Insular Board of Elections to act in connection with the registration of voters.

The applicable Sections are §§25 and 26, the pertinent parts of which we copy in the margin hereof.[1]

We are of the opinion that none of the provisions contained in these laws grants the Insular Board of Elections, acting as an appellate organization, and without granting the voter whose application to the Registration Board was not protested an opportunity to state his case, any power to decide that his name be not included in the lists and in the register of voters and of persons registered.[2] A mere reading of §31, *supra*, shows that, in the sole specific case

---

[1] "Section 25.—The Insular Board of Elections *shall keep a registry book of electors,* separately, for each precinct, stating therein, by barrios, by alphabetical order of surnames, and *in accordance with the dates of their respective registrations,* the name, age, color and address *of every person registered as an elector, with the date of his registration,* and, if subsequently excluded and re-registered, the date and cause of his exclusion, and the date and cause of his re-registration.

"A *file* shall also be kept classified by municipalities, precincts and barrios, in alphabetical order, *of all the petitions of registration,* each of which *shall have attached the original certificate of registrations corresponding* thereto, as well as the documents referring to the exclusions and re-registration of the same elector, if there is any, so that all the documents of this file shall serve *to verify the entries in the registry books.*"

"* * * * * * *

"Section 31.—The General Supervisor of Elections shall examine and investigate all petitions for the exclusion of registrations received by him within the time required by this Act, and shall notify by mail the persons whose registrations are or may be challenged, by sending them a copy of the challenges, in order that they may present evidence in the form of counter-affidavits in support of the legality of their registrations, it being understood that proof of the mailing of said notice shall be incontrovertible evidence of such fact, *and if it is shown to the satisfaction of the Insular Board of Elections from the evidence submitted in such cases, as herinbefore authorized in this Act, that a registration against which a petition of exclusion has been duly made and presented is illegal, the General Supervisor of Elections shall, if ordered to do so by the said board, immediately cancel such registrations.*" (Italics ours.)

[2] It is advisable to note, in order to avoid confusion, that the intervention granted to the Insular Board by § 31 refers solely to the procedure for excluding voters appearing in the provisional registration lists of newly registered voters provided by §§29 and 30 of the Election Law, §32 providing the corresponding right of appeal to the courts.

where the exclusion of registered voters is authorized, the Supervisor of Elections has to notify the person interested, so that he may offer evidence, and later he is granted a judicial appeal. That is to say, the registered person is heard and has his day in court.

The legislative intent that the right of qualified voters of Puerto Rico to vote, recognized by the Organic Act and the Election Law, be not eliminated without due process of law, is clearly set forth both in the Registration Act and the Election Law. Let us see now, in close detail, what the said laws provide for the purpose.

The Registration Act provides in §7 that the functions of the Registration Board are "simply administrative; that is to say, to receive and investigate applications for registration, to administer oaths to the voters in regard thereto, to make a return of the challenges against registrations by the endorsement of that fact on the back of the *registration and to refer to the judge of the municipal court or to the justice of the peace court . . . all challenged registrations. The said judge or justice shall decide, after holding a public hearing, in regard to the merits of the registration or the challenge, by accepting it or denying it.*" (Italics ours.) Further on it is provided that the decisions of the said judges shall be appealable to the corresponding district courts and the decisions of these courts shall be reviewable through certiorari proceedings by this Supreme Court.

Section 10 of the same Act provides who may protest the *registration* of the voter and again repeats the procedure to be followed.[3] And §11 provides that the voter whose

---

[3] "Section 10.—The registration board or any of its members may investigate the truth of the contents of the application, and is authorized to challenge the registration of the voter, so stating on the back of the registration, under his signature and the same oath which he took for holding his office. These applications so challenged shall be forwarded to the municipal or peace court of the respective municipality for the reconsideration of the registrations, and the voter and the challenger shall be summoned for a hearing on the

registration has been protested, shall be given one of the duplicates, stating on the back of the application the fact that it has been protested, and also imposes on the court rendering a final decision to the effect that the *registration* is legal, the duty of issuing to the voters a certificate of that fact.

Sections 13 and 15 provide for the correction of any application erroneously made, or for making the voter a new one before he leaves the registration place on registration day.

We have, therefore, in the Registration Act, a clear and concise procedure, not only as regards the manner of protesting a registration, and who may protest it, but also as regards judicial intervention, from the magistrate's court to the Supreme Court, in the determination of the legality of a registration.

Section 30 of the Election Law provides other means to obtain the exclusion of voters from provisional registration lists, and we have already quoted §31 which provides the procedure to be followed before the Supervisor of Elections. Even in the case of the Insular Board directing the Supervisor to cancel a registration in this special proceeding, §32 expressly provides that the interested party "may appeal from the decision of said Board to the municipal court of the municipality to which said registration list corresponds," or to the justice's court if no municipal court exists in the municipality. The interested party is given ample opportunity before the said courts to present evidence, inasmuch as the courts are empowered "to cite and hear witnesses and

---

challenge, and they may produce the corresponding evidence. If the court should deem that the registration is illegal, it shall order the cancellation thereof, and, if the challenge was viciously made, it shall sentence the person who made it to sixty days in jail for each challenge, and shall deprive him of the right to vote at two consecutive elections, ordering his elimination from the electoral lists. Final decisions of the courts in this matter shall be rendered not later than the month of June of the election year."

to require and examine such documents and evidence as may be pertinent in order to reach a conclusion in regard to the facts and the law in those cases."

We consider of the utmost importance, furthermore, the third paragraph of §61(*d*) of the Election Law which, in its pertinent part, reads textually as follows:

"In case it is found that a voter not duly qualified according to law to vote in an election has been illegaly included in the voting lists, any other voter may petition the district court of his domicile to eliminate the said voter from said voting lists, and the court shall do so. Such petition shall be made before September 15 of the election year, and the district court shall render judgment thereon not later than September 30 of the same year; . . . "

We have, further, that §61 (*c*) provides that "any inspector, challenger, or *voter* within a polling place may challenge a voter before such voter has cast his vote," although the challenge will not prevent the voter from voting, and §70 provides that "if any challenger has reason to believe that any person is *voting illegally,* he may challenge the vote of such person *for any reason that would make such vote illegal under the provisions of this Act,* but such challenge shall not prevent such person from voting." (Italics ours.) The form of the challenges, which must be under oath, is then provided for.

Finally, §70(*a*) provides, in its pertinent part, that:

". . . If, after any election, it should be decided by a competent court that a challenged ballot was voted by a voter who had no right to vote in that election because he did not fulfill the requirements fixed by law for voting, the court may direct the annulment of his vote and shall also direct the Insular Board of Elections to amend the report of the corresponding canvass of the vote, for the purposes of complying with the provisions of Section 91 of this Act."[4]

----

[4] "Section 91.—The Insular Board of Elections shall report to the Governor the result of the election, and the Governor shall declare the person receiving the highest number of votes for each office duly elected, and shall issue a certificate of election in due form to such person."

Sections 70(*a*) and 72 provide the penalties for all challengers who challenge the vote of a legal voter without having reason to believe that such voter is voting illegally, and for all voters who vote or attempt to vote illegally.

The picture presented by all these provisions of law shows that the Legislature of Puerto Rico took special care to provide the suitable legal remedies so as to obtain, *prior to election day,* that the names of all such persons as were, for any reason, illegally registered, be stricken from the election lists.

These remedies are: 1, the protesting procedure began by the Registration Boards and appealable to the courts (§§7 and 10, Registration Act); 2, the challenge and exclusion procedure begun by any voter before the Supervisor of Elections, decided by the Insular Board of Elections, and appealable to the courts (§§30, 31 and 32, Election Law); and 3, the ordinary action filed in a district court by any voter (§61 (*d*), Election Law). It shows, further, that if said persons have not been eliminated from the lists they may be challenged when voting, *on the very day of the election,* whether by another voter or by a challenger (§§61(*c*) and 70, Election Law), and, lastly, that *even after the election,* the votes of said persons may be annulled by the courts (§70(*a*), Election Law).

In the face of this legal situation we hold that the power of the Insular Board of Elections, as concerns the cancellation of registrations, is limited by §31 of the Election Law, *supra,* after complying with the procedure provided therein, to directing the Supervisor of Elections to cancel those illegal registrations against which an application for exclusion has been made and filed, although even in such cases the parties interested may appeal to the courts. (Section 32, Election Law.)

The cancellation of a registration, as established by the evidence presented in this case, depends in each case on the

suitable determination of various questions of fact and of law. It is clearly a judicial function. Let us take, for example, the 50,140 applications included among the 85,019 which are the subject matter of this proceeding, concerning which it is alleged that the applicants did not swear to their applications, such allegation being based on the fact that the signature of the member of the registration board administering such oath does not appear. We have no doubt that the absence of such signature in the *jurat* raises the *presumption* that the oath was not taken in said cases. Does this mean to say, however, that the 50,140 applicants did not take that oath and that they should be deprived of the right to vote by striking their names from the election lists without giving them an opportunity to be heard? To assay such an interpretation of the law would be absurd. The evidence in this case did not alone show that such a presumption could be destroyed, but also that the authorities hold that such evidence is admissible.

In the case of *Cusicks Election,* 136 Pa. 459, 20 A. 574, (1890), it was held that the absence of a jurat raises a presumption that the oath was not taken, but that said presumption could be overcome by proof that it was in fact administered. The court said:

"Why should the elector lose his vote because of the *neglect* of the officer of the law in attaching the *jurat?* Such mistake may *not only be innocent, but is likely to occur at a crowded poll, particularly in view of the fact that the election officers, in many instances, are without experience.*" (Italics ours.)

We will not cite more cases in connnection with this specific question. For other cases that support the same doctrine see the monographs in 1 A.L.R. 1568 and 116 A.L.R. 587. The case of Cusick, *supra,* shows, however, that the facts established by the evidence, both of the petitioners and the respondents in the case under consideration, do not oc-

cur only in Puerto Rico in the year 1944, but that other similar cases also occurred in Pennsylvania in the year 1890.

The determination of what in fact occurred in each specific case in those 50,140 cases is not a function of the Insular Board. It is one of a judicial character. Cf. *Roca* v. *Insular Board of Elections*, 35 P.R.R., 587, in which, not now in regard to registrations, but in regard to an election, we held that "When there is fraud, or *when fundamental errors of law are commited*, according to all precedents, it is not the Insular Board, but the courts, which must decide the case." (Italics ours.)

It is true that there are also alleged to exist, among the 85,019 applications attacked, 365 which appear unsigned by the applicants, and another 5,450 which lack, the applicant not knowing how to sign, the signature of the identification witness, and it is held that as regards these there can be no doubt that no registration has existed. We think that, as in the case of the other omissions, defects, and errors contained in the various groups given in detail in Exhibit No. 1 of the petitioners, it falls to the courts of justice to find upon the legality of the said registrations. Cf. *Funkhouser* v. *Landfried*, 22 S. E. (2d) 353.

In the case of *Pierce* v. *Superior Court*, 1 Cal. (2d) 759, the Attorney General brought an action in behalf of the State of California against 24,000 registered voters, for the purpose of cancelling their registrations. Even though no statute existed which authorized the proceeding, the Supreme Court held that "the right of the State to proceed by action in equity . . . to purge the 'great register' of fraudulent registrations may not seriously be questioned. It is one of the high prerogatives of the State to provide for and insure honest elections." Said proceeding was recognized notwithstanding the existence in California of §1109 of the Political Code which authorized the filing of similar actions by "any person." Notwithstanding, the court issued a peremptory

writ of prohibition to restrain the further prosecution of the proceedings in the lower court, since it was established that the 24,000 voters had not been summoned to appear in court.

Assuming, without deciding, that The People of Puerto Rico, represented by the Attorney General, can file a similar proceeding in the competent courts, that would be still another way of obtaining the cancellation of the illegal registrations. But even in a case of this nature the prior requirement of summoning and hearing the parties interested must be complied with always. As said in the case of Pierce, *supra:* "before the right of suffrage may be denied to an individual he must have notice and an opportunity to be heard in the manner provided by law."

The cancellation by the Insular Board of Elections of the 85,019 applications involved in the case in point, would deprive 85,019 persons, presumably qualified, of their right to vote. We have found nothing in the law to authorize the Insular Board of Elections to act as an appellate tribunal in relation to the Registration Boards, or to exercise judicial functions. If the law should grant it said power without providing for the proper summoning and hearing of the parties interested, such grant would be void. It would be more clearly so, should the contention of the respondents prevail. The law, on the contrary, provides ample safeguards so that, if these 85,019 persons registered do not have in fact the right to be included in the election lists and, therefore, to vote, their names can be excluded from said lists prior to the election; and even after the election is held their votes can be cancelled.

Section 27 of the Election Law imposes on the General Supervisor of Elections the duty, deemed by us ministerial, of causing to be "prepared a list for such precinct . . . of the voters newly registered" and to send copies not later than March 31 of the year in which an election is to be held,

to the chairmen of the local election boards and to the presidents of the principal political parties. Section 25 of the same law, *supra,* imposes on the Insular Board of Elections the duty, which we also consider ministerial, of keeping, in addition to a registry book of electors, a file of the applications for registration. The General Supervisor of Elections has consented to discharge the said duty, but not so the Insular Board. The writ of peremptory mandamus prayed for should therefore be issued.

Up to this point I have stated the opinion which did not win the approval of the majority of the court. The division, by a tie in the vote of its justices, brings as a consequence that a question as important and significant as that involved in this case is left without a definite determination either way. For, even though the Insular Board of Elections may now take whatever action it wishes to take, it is not because a majority of this court may have so found, but because a majority is required in order to restrain it from acting, in our opinion, illegally. The effect of this division, however, and the recognition made by the contrary opinion of the implicit powers of the Board, is tantamount to a refusal by a majority of this court to grant the writ on its merits.

The importance of the precedent sought to be established by recognizing implicit powers in the Board of Elections, necessitates additional comment on our part in connection with the opinion of Mr. Justice De Jesús.

In the first place, even though the Insular Board of Elections, both in its answer and in the statement of the theory of its case at the hearing, insisted that it was the Act itself which granted it power to act and not the rules it had adopted, it is held in said opinion that the Board has the said power because §§4 and 25 of the Registration Act vest it with power to adopt rules to carry out the provisions of

the law, and especially to hold peaceful and legal registrations, and also because the Insular Board adopted other rules in the year 1940, following the registrations, for the purpose of correcting errors in the applications of that year. As regards these rules adopted by a Board in which the petitioners in this proceeding had neither voice nor vote, it cannot be held as obligating them to recognize the validity of the actions of the present Board, and neither is this court obligated to decide the present case by recognizing in said organization a power not granted to it by the law, just because in the past it has illegaly exercised such power.

The power granted by the law to the Insular Board of Elections to adopt rules is simply for the purpose of *holding* peaceful and legal registrations. It refers, in our judgment, to the period fixed by the said Act for those registrations and which, in this case, expired January 15 and 16. That this is so is shown by the last sentence of §11, hereinabove cited, by virtue of which the Insular Board is authorized to prescribe such rules and to make such resolutions as may *guarantee and insure for the voter* the registration provided by the Act.

To sustain that such power implicitly includes the power to cancel applications for registration seems to us absurd. If it had been the intention of the Legislature of Puerto Rico to grant such ample power to the Insular Board it would have expressly said so and, further, would have granted the voter the remedy of an appeal to the courts of justice just as it did in the cases of protested and challenged applications. To recognize such implicit power in the Insular Board is tantamount to making it the most powerful tribunal in Puerto Rico. Without having to meet any prior requirement of serving notice on the interested party; without granting him a hearing so that he may have an opportunity to defend the legality of his registration; and lastly, without in anywise giving him personal notice of the decision of the

Board in cancelling his registration, that is, without comply-ing with the most rudimentary elements of due process of law, he will be deprived of the right of suffrage.

It is not superfluous to state here that suffrage is a fran-chise granted by our Organic Act to the citizens of the United States who have attained the age of twenty-one years, and possess the other requirements prescribed by the Legis-lature of Puerto Rico. It can be considered a privilege only in the sense that citizens over twenty-one years old may or may not meet such additional requirements. We cannot ac-cept, therefore, that any citizen can be deprived of that right through the illegal action of a board. In the course of recent debates in the Congress of the United States in connection with the manner in which the soldiers stationed at the various battle fronts will vote at the next election, the interest of the nation, and of the individual states in guaranteeing the exercise of that right on the said soldiers has been made evident. This is so precisely because this war is being waged so that we may preserve and continue to enjoy the democratic form of government in which laws, and not the illegal commands of a person or a board, are supreme.

We are of the opinion that if the Insular Board of Elec-tions has the implicit power recognized in it by the contrary opinion, there is no doubt at all that it also has the said power to cancel, without due process of law, any or all the other applications for registration out of the 277,000 which were filed at the last registrations, and power even to direct the striking from the election lists the names of those voters who have for many years been included therein, whenever the Board may for any reason decide that they are illegally included therein. The next step would be to recognize in the Board implicit power to decide, when making the canvass of the election, if fraud has existed or if fundamental errors

of law have been committed, notwithstanding that we have held in the case of Roca, *supra,* that such is a judicial function.

We accept that we must presume that official duty has been regularly performed, but that does not mean that there must be fraud of some kind before the Insular Board may, in the exercise of the implicit power it is wished to recognize in it, eliminate without notice all those persons who in its judgment are unduly included in the election lists. Such persons might learn of the consummated fact through the press, provided they can buy or otherwise acquire the newspaper publishing the news. We are not told what means they will use to find out in case they do not know how to read.

What the contrary opinion is doing, in fact, is deciding the case on its merits. For ourselves, we go no further than to say that all of the 85,019 voters presumptively registered are subject to challenge in the various ways that appear from the law, and to which we have heretofore referred. The determination as to whether they are or are not such voters is a judicial function, and in our judgment the Board is not the one called upon to determine if a judicial question exists, and then proceed to decide it.

In accordance with the terms of our opinion we have shown the various ways in which the political parties affected can obtain that those voters who should, not appear in the election lists be stricken therefrom before the election, and can obtain, even after the election is held, that their votes be annulled. It is held in the contrary opinion, in the face of these suitable remedies, that the voters now eliminated by the Insular Board of Elections "can institute the proper proceeding to obtain that they be included, if they are entitled thereto." What remedy? The law does not provide it. The conclusion, furthermore, is predicated on the fact that it constitutes sufficient notice for the voter

whose name has been stricken out that he can learn of such action through the lists posted to the public or the lists of the local committee of each party. We reject the assertion that it constitutes "frivolous contention" to maintain that such a way of giving notice imposes on the citizen "a duty that he is not obligated to discharge." What law imposes that duty? What provision of law establishes this novel way of serving notice on a citizen who is deprived of his right to vote without even a hearing? As regards notices or advices given through the newspapers it is also necessary, in order for them to be valid, that they be authorized by a statute. The Election Law makes no such provision. We continue, therefore, within the field of "implicit" powers or duties.

The triplicate of the application for registration as delivered to the voter in accordance with §11 of the Act without stating therein any protest, constitutes, as far as the voter is concerned, his certificate that he has been duly registered. It is true that he could have investigated, before leaving the registration place, if the said triplicate was complete, but the fact that he did not do so might depend on various questions of fact involving at the same time questions of law which shows the judicial character of the determination—and we should not decide that the Insular Board has a priori the implicit power to cancel every application that in its judgment and ex parte, does not meet all the requirements of law. Cases may exist, for example, among the 85,019 applications, where the triplicate delivered to the voter is complete and where the members of the Registration Board, or any of them, through error or negligence, have failed to sign the original and the duplicate. Can it be held that these are not typical cases involving a judicial question to be decided by the courts?

Sections 7 and 10 of the Registration Act do not in any way limit the reasons for which the registration of a voter

may be protested. Any member of the Registration Board could have protested one or more of the 85,019 applications for any of the defects they contain. The reasons for *challenging* which are in fact limited by §30 of the Election Law should not be confused with the reasons for *protesting* that the legislator took special care not to limit in any manner. And this is so, for otherwise, if the protest (*protesta*) were the same as a challenge (*recusación*), what reason could the legislator have had to provide *two* different stages and *proceedings* to obtain the same results from the same motives? We must construe these laws according to what they themselves say, so that the legislative intent in passing them may be enforced.

As regards the power vested in the Insular Board pursuant to §25, this Section provides, first, that a registry book of electors shall be kept in accordance with the dates of their applications for registration, and also a file of applications for registrations with the certificates of registrations corresponding thereto, and that such file shall serve to verify the entries in the registry books. Nowhere in §25 or in any other Section of the Act is it provided that the registrations shall not be consummated until the Insular Board *passes* on the applications and *directs* their inclusion in the registry of electors. If the law contains such provision, why then say that the power of the Insular Board is implicit? Had the law contained such a provision surely the petitioners would not have filed this action.

Section 11 is conclusive and by itself alone decides the question raised in this case. It reads as follows:

"Section 11.—Each voter whose *registration* is accepted by a registration board shall be given one of the duplicates duly signed by the members of the board; another shall remain in the possession of the local election board, *and the original shall be sent to the General Supervisor of Elections for the preparation* of the voting lists. When a petition for registration is challenged, one of the duplicates shall be delivered to the voter *in the same manner as in the case of any*

324

*other registration, but the fact that it has been challenged shall be stated on the back thereof.* If it is finally decided that the *registration is legal, the court rendering such decision shall issue to the voter, free of cost, a certificate to that effect."* (Italics ours.)

It establishes the fact that it is the Registration Board which, upon receiving the registration of a voter, shall deliver to him one of the duplicate of the application duly signed by the members of the Board, which shall keep another copy and send the original to the General Supervisor of Elections for the preparation of the voting lists. The Insular Board of Elections does not intervene, does not revise, does not direct; it is not given any intervention. It is the General Supervisor to whom the originals of these applications are sent directly in order to prepare the lists of newly registered voters as provided in §27 of the Election Law.[5] Neither does this Section give any intervention to the Insular Board. Now then can it be held that it has power, not merely implicit but vested in it by law, to pass on the applications for registrations and direct or not their inclusion in the files and in the provisional lists? It is the courts, in the case of protested applications, which decide, in accordance with §11, *supra,* if the registration is or is not legal. Contrary to what is said in the opinion we contest, it is one of the copies prepared by the General Supervisor that is retained in the files of the Insular Board; in other

---

[5] Section 27 of the Election Law, in its pertinent part, provides as follows:

"Section 27.—The General Supervisor of Elections *shall cause to be prepared a list* for each precinct, by barrios, and in alphabetical order, *of the voters newly registered,* stating therein the name, age, color, sex, and address of said electors. Copies shall be made of said lists, which copies, not later than March 31 of the year in which an election is to be held, shall be sent by special messenger or registered mail to the chairman of the local election board of the election precinct to which they respectively belong, and to the chairmen of the sections and local committees of the principal political parties, and one copy shall be retained in the *files* of the Insular Board of Elections. Immediately upon receiving said lists, the chairman of the local election boards shall post a copy in a conspicuous, accessible, and protected place at the entrance to the offices of their respective boards, and shall keep the remaining copy in thé files of the local election board."

words, the law expressly designates the ministerial duties that both the General Supervisor and the Insular Board have to discharge.

█ We hold that the registration is consummated on registration day if the application has not been protested. It is the law that so expressly recognizes it and determines it in accordance with all its provisions. What we do not have the right to decide, by interpretation, is that the legislator did not mean to say what his words expressly state, and in this way establish an implicit power that the law does not grant to the Insular Board. We hold that the law is clear and free from all ambiguity and that, therefore, we must not disregard the letter of the law under the pretext of fulfilling the spirit thereof. Section 13, Civil Code.

█ What the Registration law does say, *expressly,* in §11 thereof, is that the original of the application for registration shall be sent to the General Supervisor of Elections (not to the Board) "for the preparation of the voting lists" to which §27 of the Election Law refers. It is the legal duty of the General Supervisor to prepare the provisional lists by taking the data from the originals of said applications, *without intervention of any kind from the Insular Board,* and that duty is clearly ministerial.

We have not said, nor do we hold, that the registration boards "have more powers than the Insular Board of Elections who appoints them." In the first place, the Insular Board does not appoint them, and in the second place, we would reject any proposal tending to maintain that the registration boards have implicit or express power to cancel registrations.

█ It is easy to say that the voters included in the 85,019 applications, when the latter are cancelled by the Insular Board, can prosecute independent actions to obtain that they be reincluded in the lists of voters. The law does not

provide such remedy and we must not forget, furthermore, that we are dealing here with a poor people for the most part illiterate. The registrations, in accordance with the law (we do not tire of repeating it), are ended. Those who have their certificates of registration without any protest written on the back thereof, have to presume that the next step they must take is to vote on election day. Our opinion does not hold that they may vote but that they may be excluded from the lists or challenged and their votes annulled by the courts. This result can be obtained by the several political parties affected. By appealing to the courts they can, if they wish, prevent fraudulent voting, or eliminate or annul it. The law provides sufficient remedy to leak the doors on fraud. What it does not provide is any remedy for the voter, to whom the Board has closed the door by cancellation of his registration without due process of law in order to have his name included anew in the voting lists.

The case of *Scott* v. *Vaughn,* 168 N. W. 709, the only one cited in support of the contention of the respondents, is not applicable to the facts of the case we are deciding and to the laws we are interpreting. The Michigan Constitution expressly provided that the Secretary of State, upon receipt of the petition for amendment, shall canvass the same to ascertain "if such petition has been *signed* by the required number of qualified electors, and if the same has been so signed the proposed amendment shall be submitted to the electors at the next regular election . . . " He was vested, therefore, with express power to ascertain if the petition was or was not made in legal form. It is obvious furthermore, that if he rejects the petition he has to give notice to the interested parties.

From the standpoint of the contrary opinion we concede that this is not a class action inasmuch as the determination of the validity of each petition depends upon different facts. Nevertheless from the point of view from which we have

approached the problem, it is a class action, inasmuch as the cancellation in mass, without a hearing, without notice, without compliance with any of the requirements of the law by the Insular Board, affects in the same manner 85,019 voters.

We admit that a writ of mandamus should not be issued unless the duty to be complied with be clearly a ministerial duty. We hold that it is so in this case. The Attorney General, in behalf of the General Supervisor of Elections, has consented to the petition because he admits that his duty is ministerial and that the cancellation of a registration pertains to the courts and not to the Insular Board. If that is his opinion—and we hold that it is correct—he does not require any order, either from the Board or from this court, to enforce it.

I am authorized to say that Mr. Justice Snyder is in accord with this opinion.